UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| ALBERT NORFOLK, # 234993, | ) | |
| | ) | |
| Petitioner | ) | Case No. 1:04-cv-573 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| MARY BERGHUIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner was convicted, following a jury trial, of carrying a concealed weapon (CCW), MICH. COMP. LAWS § 750.227, felonious assault, MICH. COMP. LAWS § 750.82, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  He was sentenced as a second habitual offender to prison terms of 1-to-7½ years on the CCW conviction, 1-to-6 years on the felonious assault conviction, and a mandatory, consecutive 5-year term for the felony-firearm conviction.  Judge Colleen A. O'Brien of the Oakland County Circuit Court imposed the sentences on February 19, 2002.  The Michigan Court of Appeals affirmed these convictions on October 21, 2003, and the Michigan Supreme Court denied discretionary review.

Petitioner brought the present habeas corpus action by timely petition filed August 26, 2004.  The *pro se* petition raises the following grounds for relief, each of which had been raised and rejected in the state courts:

      A.     Petitioner's convictions were obtained by use of an involuntary confession.

      B.     The convictions were obtained in violation of the privilege against self-incrimination, because petitioner's statement was not recorded by audio or videotape.

      C.     The evidence was insufficient to sustain a jury verdict on the felonious assault charge.

      D.     The trial court violated petitioner's due-process rights by admitting evidence that he was on parole at the time of the offense.

      E.     The assistant prosecutor was guilty of misconduct during final argument.

(Petition, ¶ 14, docket # 1).  Respondent has filed an answer to the petition, supported by the state-court record.  Respondent argues that petitioner's first four grounds should be dismissed on their merits, and that the claim of prosecutorial misconduct is barred by the doctrine of procedural default, arising from petitioner's failure to lodge a contemporaneous objection in the trial court.  Petitioner has filed a responsive brief.  (docket # 25).  Upon review of the record, I conclude that petitioner's grounds for habeas corpus relief are meritless and recommend that the petition be denied on its merits.

**<u>Proposed Findings of Fact</u>**

**A.      Preliminary Examination and *Walker* Hearing**

        The state prosecution arose from an incident that occurred in and around the City of Detroit on August 4, 2001, at 6:45 a.m.  Detroit police officers Daniel Bryant and Sheila Daniel, while on routine patrol, saw a vehicle enter the service drive of the I-75 expressway north of Six Mile Road.  The officers observed the vehicle weaving on the expressway.  They followed it until the driver exited at Eight Mile Road.  The officers observed the car stopped for a red light at the intersection of John R. and Eight Mile Road.  When the light turned green, the driver did not move, but sat at the intersection.  The officers ultimately stopped the vehicle, as they suspected its driver was operating under the influence of alcohol.  The driver, Albert E. Norfolk, exited the vehicle, but fled on foot when Officer Bryant felt a handgun in the suspect's waistband while he patted him down.  A short foot chase ensued.  Officers alleged that petitioner pulled the handgun from his waistband and pointed it at Officer Bryant, who shot petitioner once in the chest.

        Petitioner was charged in a criminal complaint with four felonies:  being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; carrying a concealed weapon (CCW) in a motor vehicle, MICH. COMP. LAWS § 750.227; felonious assault, MICH. COMP. LAWS § 750.82; and possession of a firearm during the commission of a felony, second offense, MICH. COMP. LAWS § 750.227b.  Additionally, the prosecutor filed a notice of habitual offender, second offense, MICH. COMP. LAWS § 769.10, as petitioner had previously been convicted of armed robbery and possession of a firearm, for which he was on parole at the time of this incident.  Although the pursuit began in the City of Detroit, it ended in Hazel Park, Michigan, in Oakland County.  The Oakland County Prosecutor therefore assumed jurisdiction of the case.

Petitioner and counsel appeared before the 43rd District Court for a preliminary examination on September 4, 2001.  (*See* Preliminary Examination Transcript (PE), docket # 15). The prosecution presented only the testimony of Officer Daniel Bryant, who testified to the early morning events of August 4, 2001.  Officer Bryant testified that, after he and his partner stopped petitioner's vehicle to investigate a suspected OUIL offense, Bryant felt a handgun in petitioner's waistband during a routine pat-down procedure.  (PE, 11-12).  Petitioner took off running.  As the officer rounded a corner, he observed the weapon in petitioner's hand.  (PE, 12).  Bryant then drew his weapon and was able to push petitioner down to the ground.  Petitioner began to roll over to face the officer, and Bryant yelled, "Man, don't do it; don't do it, man."  (PE, 14).  Petitioner, while seated on the ground, began to raise the handgun towards the officer, at which point the officer fired his weapon, striking petitioner in the chest.  (PE, 14-16).  The officer was able to kick the gun out of petitioner's hand.  (PE, 16).  After cross-examination by defense counsel, the district judge found probable cause to bind petitioner over for trial on all charges.  (PE, 29).

On motion of petitioner, count 1, which charged him with being a felon in possession of a firearm, was severed from the remaining counts.[1]  The Oakland County Circuit Court, Judge Colleen A. O'Brien presiding, conducted a three-day jury trial on the remaining charges on January 22, 24, and 25, 2002.  (*See* Trial Transcripts (TT), docket #'s 16, 17, 18).  After the jury was empaneled, but before trial began, the trial court conducted an evidentiary hearing on petitioner's motion to exclude from evidence a statement petitioner gave to investigating officers on the day of

---

[1] The felon-in-possession charge was ultimately dismissed by the prosecutor.

-4-

the incident.[2]   The sole issue at the *Walker* hearing was the voluntariness of the confession.  The prosecutor called Dr. Greg Alan Howells, Detective Sergeant Bruce Gene Arthur (who took petitioner's statement), and Julie de Maria, a nurse who was present during the taking of the statement in Beaumont Hospital.  Dr. Howells, Chief of Trauma Surgery at Beaumont Hospital, saw petitioner in the emergency room at about 7:20 a.m.  (TT II, 120).  Petitioner had suffered a gunshot in his right chest and displayed symptoms of a hemothorax, or collapsed lung.  (*Id.*).  After applying a local anesthetic, Dr. Howells put in a chest tube to reinflate the lung.  (*Id.*, 120-21).  Testing of the blood drawn at 7:20 a.m. showed that petitioner had a blood alcohol level of .233 at that time, and petitioner smelled of intoxicants.  (*Id.*, 124-25, 131).  When Dr. Howells finished the procedure, petitioner was stable.  (*Id.*, 131).  Petitioner was given morphine at 8:30 a.m. and again at 11:30 a.m., in dosages sufficient for pain management (*id.*, 121-24), but the dosage was reduced to avoid potential respiratory depression.  (*Id.*, 126).

Detective Sergeant Bruce Arthur of the Hazel Park Police Department was in charge of the investigation.  He arrived at the hospital at approximately 2:30 to 3:00 p.m. on August 4, 2001. (TT II, 135-36).  (This was approximately seven hours after petitioner's blood alcohol level registered .233 and three hours after petitioner had received his last dose of morphine.)  At the time of the interrogation, four officers were in the room:  Detective Arthur, Sgt. Barner, and two officers guarding petitioner.  (TT II, 136, 144).  Detective Arthur asked petitioner questions, such as his name, date of birth, and where he was, to determine his level of alertness.  (*Id.*, 136-37).  The officer testified that petitioner appeared to understand the questions and was able to answer appropriately,

---

[2] Such hearings are called "*Walker* hearings" in Michigan practice, after *People v. Walker (on rehrg)*, 132 N.W.2d 87 (Mich. 1965).

although his speech sounded "groggy."  Arthur advised petitioner of his *Miranda* rights and read aloud the waiver portion of the police department's *Miranda* form.  (TT II, 137-39, 152).  Although petitioner verbally acknowledged that he understood each of the rights, Arthur decided not to ask petitioner to sign the waiver form since petitioner's injury was on his right side.  (*Id.*, 139).  Petitioner also declined the presence of an attorney.  (*Id.*).

Detective Arthur informed petitioner that the Detroit police officer claimed that petitioner had tried to shoot him.  (TT II, 140).  Petitioner then became "very awake" and seemed "upset," denying the officer's version of events.  From that point on, petitioner appeared "wide-eyed" and talkative and did not seem groggy.  (*Id.*, 155).  Petitioner said that he ran from the officers because he was on parole and did not want the officers to find him with a gun.  (*Id.*, 141).  He fell while running from the officers and attempted to throw the gun over a fence.  He claimed that he was then shot in the back.  (*Id.*, 140-41).[3]  Detective Arthur asked to see petitioner's wound and asked for permission to take photos of it.  (TT II, 142).  Petitioner wanted the photographs taken, but Beaumont Hospital insisted that petitioner sign a waiver form.  The nurse then arrived, and petitioner consented.  Detective Arthur testified that petitioner "became happy" when he learned that Officer Bryant was from the Detroit Police Department and began talking about a lawsuit.  (*Id.*, 142).  Detective Arthur promised that petitioner could have access to any photos taken.  After the photos were taken, the discussion ended.  (*Id.*, 142).  On cross-examination, Arthur testified that the conversation had gone on for about fifteen minutes to a half hour before the officer noted the time on the *Miranda* form.  (*Id.*, 144).  He denied smelling any odor of intoxicants at the time he

---

[3] Petitioner's claim that he was shot in the back was not supported by any evidence.  The evidence at trial showed that the bullet had entered from the front and exited through the back.  (TT II, 248-252; TT III, 503).

interviewed petitioner.  (*Id.*, 147).  He testified that the mood of the conversation was not angry and that "there was even joking going on during our conversation."  (*Id.*, 146).

Nurse Julie DiMaria was on duty when the detectives came to interview petitioner. (TT II, 159).  She testified that he seemed alert and understood what was going on.  (*Id.*, 159-160). She denied observing the officers threaten or shout at petitioner.  (*Id.*, 159).  Ms. DiMaria confirmed that petitioner wanted to have pictures taken and signed the Beaumont Hospital release form for this purpose.  (*Id.*, 160).  On cross-examination, defense counsel pursued the question of petitioner's medication.  The nurse confirmed that the last administration of morphine received by petitioner was four milligrams at 11:40 a.m.  He received an additional four milligrams immediately after the police interview.  (*Id.*, 164).  She testified that the effect of morphine was "subjective" and varied among patients.  (*Id.*, 163-67).

Defense counsel called petitioner.  Petitioner testified that he had consumed four or five beers and three-quarters of a pint of cognac between 7:30 p.m. on August 4 and 2:00 a.m. on August 5, 2001.  (TT II, 172-73).  He was in pain when he arrived at the hospital and was given morphine.  (*Id.*, 174).  He testified that his memory of the interview was "foggy" and that he was not alert.  (*Id.*, 182-83).  He did not recall Detective Arthur advising him of his rights or seeing the *Miranda* waiver form.  (*Id.*, 176-78).  He did, however, remember being questioned by Detective Arthur, but claimed he refused to answer at first.  (*Id.*, 180-81).  Detective Arthur then got an angry look on his face, and petitioner became afraid that the officers would shoot him again.  (*Id.*, 185-86). He said that the only thing he told Arthur thereafter was that he had fallen down, and he claimed that he only said that because he was afraid.  (*Id.*, 181-87).  He specifically denied ever telling Arthur that he had a gun, that he was on parole, that he ran from officers because he did not want to be found

with a gun, or that he was trying to throw the gun away.  In fact, he denied ever having a gun.  (*Id.*, 181-82, 199).  At the conclusion of the hearing, Judge O'Brien made oral findings of fact, set forth verbatim below:

> Okay, After listening to the testimon – testimony in this matter, I found that the testimony of the detective in this matter, Detective Arthur, was credible. I found that the testimony of the nurse, Miss DiMaria, was credible. I find that although the defendant had been given morphine, which definitely is a significant drug that could have an effect on him, about three hours had passed since it had been administered. He was found by the nurse to be alert. The atmosphere in the room was not one of a threatening nature, according to her testimony. She indicated the defendant wanted to have his picture taken in this matter and was voluntarily submitting to that. That doesn't indicate to me a person that was under the influence of medication to the extent where it would somehow have an influence on his ability to think clearly in this matter.
>
> I – I find the testimony of the Detective credible, that he did give the defendant his *Miranda* rights. I also note the defendant has had contact with the law before, significant ton – contact. He does have some knowledge of how things work in the legal system. I believe he has been read his rights on other occasions and was aware of the right to have an attorney. He was being given medical attention. And therefore, I find that the statement that was given in this matter is admissible.

(TT II, 210-11).

### B.    Trial Proceedings

At the conclusion of the *Walker* hearing, the case proceeded immediately to trial. During opening statement, defense counsel denied that petitioner assaulted the officer with a handgun and contended instead that the officer "got nervous as he turned the corner while he was chasin[g] the defendant and fired his weapon."  (TT II, 239).  Counsel contended that petitioner "didn't even have a gun."  (*Id.*).

The prosecution called eleven witnesses:  Dr. Howells, Officer Bryant, Officer Sheila Daniel (Bryant's partner), Officer Eric Smith (a Detroit police officer who responded to the scene

after the shooting), Officer Jason Porta (a Hazel Park officer who responded to the scene), Officer Matthew Viviano (another Hazel Park officer), Officer Edward Bicego (a Hazel Park officer sent to the hospital to secure evidence and take petitioner into custody), Michael Arrowood (a State Police expert in firearms identification), Tracee McIntosh (a State Police fingerprint expert), Detective Sergeant Arthur, and Nurse Julie DiMaria. The defense called no witnesses. To the extent relevant to the habeas corpus issues now before the court, the testimony of these witnesses is summarized below.

The testimony of Dr. Howells, regarding the nature of petitioner's bullet wound and the medication and treatment he received at Beaumont Hospital, was consistent with that given at the *Walker* hearing. (TT II, 244-258).

Officer Daniel Bryant, the Detroit police officer who was the alleged victim of the felonious assault, testified next. He recounted the events of the early morning of August 4, 2001, in which he and his partner Sheila Daniel observed petitioner driving erratically and ultimately decided to pull him over on suspicion of drunk driving. (TT II, 264-67). As the officers spoke to petitioner, while petitioner was still in his car, Bryant could smell a strong odor of intoxicants and observed petitioner's eyes to be glassy and his speech slurred. (*Id.*, 269). Bryant directed petitioner to get out of the car and had him place his hands on the trunk so that the officer could pat him down for weapons before administering the field sobriety test. (*Id.*). As Bryant reached for petitioner's right front waistband, he felt a hard object that he believed to be a weapon. At that point, petitioner took off running westbound on the sidewalk of Eight Mile Road. (*Id.*, 269-270). He and his partner then began to chase petitioner on foot. After chasing petitioner for about 100 yards, the officers passed the corner of a building and Bryant saw petitioner "pull a Glock from his waistband with his

right hand." (*Id.*, 270).  The officer then drew his weapon, took a few more steps, and pushed petitioner from the back, causing him to fall forward. (*Id.*, 270-71).  Petitioner took a few more steps forward and then fell on his stomach.  The officer walked up behind him, and petitioner began to roll over to a sitting position. (*Id.*, 271).  At this point, the gun was still in petitioner's right hand.  The officer yelled to him "Don't do it, man, don't do it," but petitioner continued to raise his weapon up and directed it at Officer Bryant. (*Id.*, 272).  "In fear for my life, I fired my weapon." (*Id.*). Petitioner fell to the ground, and the officer was able to kick the weapon from petitioner's right hand. Officer Bryant identified a black Glock semi-automatic handgun (People's Ex. 6), which he identified as the weapon that petitioner pointed at him.  (TT II, 274).

Officer Sheila Daniel, Bryant's partner, testified next.  She also recounted the events leading up to the traffic stop.  (TT II, 310-11).  As Bryant was attempting to pat petitioner down for weapons, he took off running. (*Id.*, 314-15).  As Bryant chased petitioner, Officer Daniel ran behind them, but began to lose ground.  Petitioner and Bryant ran around the corner of a building, and Daniel lost sight of them.  She then heard her partner say, "Man, don't do it.  Man, don't do it." Then she heard a shot. (*Id.*, 317).  She slowly went around the corner, because she did not know who had fired the shot.  She then saw Bryant standing over petitioner, who was lying on his stomach. She observed a black 9 millimeter handgun on the ground approximately six feet from petitioner. (*Id.*, 318).  She then called for backup and emergency medical services. (*Id.*, 319).  On cross-examination, Daniel testified that she did not see a weapon in petitioner's hand as she was running after him (*Id.*, 331), and that her gun was in her holster during the chase. (*Id.*, 332).

Officer Eric Smith of the Detroit Police Department was on duty on the morning of August 4, 2001, and received a call of shots fired in the area of John R. and I-75.  (TT II, 344).

When he arrived at the scene, he observed Sgt. Wheeler from Precinct 12 standing over a black male, who was lying face down on the ground about five feet from a blue steel automatic handgun. (*Id.*, 345-46).  The sergeant directed Smith to recover the weapon, which was a Glock 9 millimeter. (*Id.*, 346).  The officer inspected the weapon and found that it was loaded with 9 millimeter hollow point bullets. (*Id.*, 347).  He also noted that the serial numbers on the slide and in front of the trigger guard had been removed.  He secured the weapon in the trunk of his vehicle. (*Id.*, 347).

Jason Porta was an officer of the Hazel Park Police Department who responded to a call of "shots fired" at Eight Mile and John R. (TT II, 358-59).  By the time he arrived, there were already other police officers at the scene.  The officer saw petitioner lying face down on the ground, with a semi-automatic pistol lying on the ground to the west of him. (*Id.*, 360).  Porta was directed to impound petitioner's vehicle and searched it incident thereto. (*Id.*, 361).  Upon searching the trunk, he found within a brown duffel bag a pistol case for a 9 millimeter Glock pistol. (*Id.*, 362).  The pistol case itself was introduced into evidence as People's Exhibit 13. (*Id.*, 364).  Inside the pistol case, Officer Porta found a loaded magazine. (*Id.*, 365).  The pistol case bore the serial number DCN315US.  On cross-examination, the witness established that the handgun seized from petitioner (Peoples Ex. 6) would fit into the gun case. (TT II, 368-69).  In addition, the magazine in the gun case was of the same size and type as that found in the pistol itself. (*Id.*, 369).

Matthew J. Viviano was also a Hazel Park police officer who responded to the scene. (TT II, 376-77).  By that time, petitioner had been taken away by ambulance. (*Id.*, 377).  His testimony, which was devoted to identifying a wallet, a spent 40 caliber cartridge, and other evidence that he secured at the scene, is not germane to the issues now before the court.

Edward Bicego was a Hazel Park police officer sent to Beaumont Hospital to retrieve the bullet that Dr. Howells found lodged between petitioner's back and his jacket, as well as any other evidence.  (TT III, 400-401).  Additionally, this officer was assigned to guard petitioner while he was in the hospital and was present in that capacity when Detective Sgt. Arthur took a statement from petitioner.  (*Id.*, 404).  Officer Bicego testified that he did not threaten petitioner, nor had anyone else.  (*Id.*).  It was not part of his duties to interrogate petitioner, nor did he do so.  (*Id.*, 405-06).

Michael Arrowood was employed by the Michigan State Police in its Firearms Toolmark Unit.  (TT III, 406).  In his examination of the Glock 9 millimeter pistol seized from petitioner, he was able to restore the obliterated serial number, which he identified as DCN315.  (*Id.*, 410-11).  This was the same serial number on the gun case seized from the trunk of the car driven by petitioner.  (*Id.*, 411).

At the end of Mr. Arrowood's testimony, the assistant prosecutor and defense counsel stipulated that petitioner was on parole at the time of this incident.  This stipulation was made pursuant to the court's earlier ruling on a motion *in limine* brought by defense counsel, who had argued that evidence of petitioner's parole status would be prejudicial.  The prosecutor argued that the evidence was relevant to motive, to explain why petitioner fled when the officer found a concealed weapon.  (TT I, 11-23).  The trial court ultimately ruled against petitioner on the issue.  (TT II, 211-12).  The issue was argued and decided purely as a matter of state law.

Witness Tracee McIntosh was employed by the Michigan State Police as a fingerprint evidence analyst.  (TT III, 413-14).  Her analysis of the Glock 9 millimeter pistol did not produce any identifiable latent prints.  (*Id.*, 417).

-12-

The prosecution called Detective Sgt. Bruce Arthur, the investigating officer for the Hazel Park Police Department. Detective Arthur took oral and written statements from Detroit police officers Bryant and Daniel. (TT III, 438-441). Later in the day, he and Sgt. Barner interviewed petitioner in his hospital room. (*Id.*, 442). The detective's testimony concerning the circumstances surrounding the interrogation was consistent with his testimony at the *Walker* hearing. Detective Arthur related the substance of petitioner's confession, as follows:

> Q    Okay. Did he relate to you his version of events?
>
> A    Yes.
>
> Q    If you could tell us what that is?
>
> A    He had stated that he was driving. He left the coney island and he was drivin' down the road. He said he got on Eight Mile and the officers got behind him and stopped him. He said he pulled right over. When the officers asked him to get out of the vehicle, he complied. He was doing everything that the officers were telling him to do. He stated that, when he walked to the back of the vehicle, he knew he had his gun in his waistband. He stated that he knew he shouldn't have had the gun, based on him bein' on parole. And he stated that, when the officers went to pat him down, he became scared and ran.
>
> He stated that he wasn't trying to shoot at the officer, he was tryin' to get rid of the gun. He said when he rounded the corner, he attempted to throw the gun. At that time, he stated he fell. I questioned him based on, did you actually fall or were you pushed from behind as Officer Bryant stated? Mr. Norfolk said, no, I fell. He said that when he fell, he fell face--face first and the gun came out from under his--from--from his hands. He said at that particular time Officer Bryant shot him in the back.
>
> Q    Was there any further discussion about him being shot in the back?
>
> A    Yes.
>
> Q    What was that?

A       There was discussion that--we had stated that we didn't believe he was shot in the back. Officer Bryant said he shot him and the doctors are tellin' us that he was shot under his armpit. He didn't believe that. He stated that he had watched, I believe it was A & E or something to that effect, and knows what a bullet wound looks like. At that point, we asked to take photos of his injury. Mr. Norfolk agreed and actually wanted the photos taken.

Q       Did he say why he wanted the photographs taken?

A       Well, yes. We had spoke in reference to Officer Bryant bein' a Detroit Police Officer and us bein' a--in--in Hazel Park. Mr. Norfolk got happy and referred to a lawsuit, that he would get a lot of money bein' shot in the back from a Detroit Officer out of--out of his city. At that particular time, he agreed to the photos.

(TT III, 449-450).

The last witness was Nurse Julie DiMaria, who testified consistently with her *Walker* hearing testimony concerning petitioner's level of alertness and the circumstances surrounding the taking of petitioner's statement. (TT III, 495-99).

After the prosecution rested, defense counsel made a record of petitioner's informed decision not to testify (TT III, 507-09). Counsel also made a record of petitioner's acquiescence in the strategy of not requesting instructions on lesser-included offenses, as that would be inconsistent with petitioner's position that he did not commit an assault of any kind. (*Id.*, 509-511). The defense rested without presenting any evidence.

Counsel delivered their closing arguments. The assistant prosecutor's closing argument emphasized the nature of the trial as a credibility contest between the officers and petitioner. "Either the defendant is guilty based on the evidence of the charges against him, or the officers and everyone else involved is lying. It's that simple." (TT III, 533). He pointed out that, to believe petitioner's version of events, a jury would be required to conclude that all the officers in

-14-

two different police departments, as well as the doctor, conspired. (*Id.*, 533-34). The assistant prosecutor never contended that petitioner (who did not testify) was lying, nor did he in any other way attempt to impugn petitioner personally. He did, however, pointedly argue that the defense's position required the jury to conclude that all the prosecution witnesses were untruthful.

Defense counsel denied that his theory involved a police conspiracy and denied that his position was based on the proposition that everyone who came into the courtroom lied. (TT III, 541). Defense counsel focused on inconsistencies between the testimony of Bryant and Daniel, the two Detroit police officers. (*Id.*, 542-44). He also focused on the fact that the Detroit officers appeared with lawyers for their interview with Hazel Park detectives. (*Id.*, 544-45). He argued that the credibility of the officers was an issue for the jury to decide. Counsel emphasized the lack of his client's fingerprints on the handgun and the failure by police to check other items of evidence for prints. (*Id.*, 553-56).

After instructions, the jury retired to deliberate. After deliberating for about an hour and a half, the jury returned a verdict of guilty on all counts.

## C.    Appellate Review

Petitioner, through appointed counsel, appealed as of right to the Michigan Court of Appeals. His appellate brief raised the following five issues for review:

I.    The trial court erred where it found that the defendant's involuntary confession, induced by his intoxication from the consumption of alcohol, injection with morphine to treat his severe pain as the result of a gunshot wound, and the product of coercive circumstances, was admissible at trial.

II.    The trial court should have suppressed defendant's confession where the police, while having the capability to do so, failed to make an audio or video recording.

III.    The prosecution failed to produce sufficient evidence at trial to sustain a jury verdict, finding that the defendant was guilty beyond a reasonable doubt of the crime of felonious assault MCLA 750.529.

    a.    The offense of carrying a concealed weapon cannot be the predicate felony for a felony firearm charge under MCLA 750.227b

IV.    The trial court abused its discretion in ruling that the prosecutor could establish that the defendant was on parole as admissible motive evidence without employing a balancing test under MRE 403, while severing the felon in possession of a firearm count on the basis that informing the jury that he was a convicted felon was too prejudicial to his right to a fair trial.

V.    Defendant was denied his right to a fair trial under the Michigan and Federal Constitutions by the intentional prosecutorial misconduct, in his improper and highly prejudicial argument to the jury when he vouched for credibility of his witnesses, bolstered the validity of his case, denigrated the defendant and his defense, argued about the facts not in evidence, and mischaracterized the evidence presented at trial.

By *per curiam* opinion issued October 21, 2003, the Michigan Court of Appeals affirmed petitioner's conviction.  In reviewing petitioner's challenge to the voluntariness of his confession, the court applied federal principles, as adopted by the Michigan Supreme Court, under which a review of the "totality of the circumstances" determines whether a confession was freely and voluntarily made.  The appellate court made the following factual findings in the course of its review:

In the present case, defendant was twenty-eight years old, capable of understanding the English language, both written and spoken, and had prior contacts with the criminal justice system. Defendant alleged that his consumption of alcohol and treatment with morphine at the hospital left him with a "foggy" recollection of what occurred during his interview at the hospital. Defendant denied making a statement to the police. However, defendant's surgeon and nurse testified that the defendant cooperated with police, and she did not see any evidence of threats or coercion. Police testified that defendant wanted to have his wounds photographed for future litigation because he insisted that he had been shot in the back, contrary to the medical evidence. The trial court concluded that the testimony given by the police and the medical personnel was credible. Giving deference to trial court's assessment

-16-

of the credibility of the witnesses, we cannot conclude that the trial court's denial of the motion to suppress was clearly erroneous.

(Op., 2).

Petitioner's second appellate issue, which asserted a due-process claim arising from the failure of police to record his confession, was based upon an invitation that the state courts fashion a new rule of state constitutional law, following the Alaska Supreme Court decision in *Stephan v. State*, 711 P.2d 1156 (Alaska 1985). The state appellate court refused to do so and adhered to its previous published decision that recording is not constitutionally required. (Op., 2).

The court reviewed petitioner's challenge to the sufficiency of the evidence to support his conviction for felonious assault to determine whether the evidence, viewed in a light most favorable to the prosecution, would have justified a rational trier of fact in finding that each element of the crime was proved beyond a reasonable doubt. The court found that the testimony offered by Officer Bryant indicated a purposeful, controlled act in raising petitioner's weapon towards the officer, sufficient to prove an assault with a dangerous weapon with the intent to injure or place the victim in reasonable apprehension of immediate battery. (Op., 3).

The court reviewed petitioner's challenge to the admission of evidence concerning his parole status for abuse of discretion under state-law principles. The court found that the probative value of the parol evidence with regard to the question of motive was not substantially outweighed by the danger of unfair prejudice. The court also noted that the trial court tailored the ruling to preclude introduction of the underlying facts regarding petitioner's parole. In these circumstances, there was no abuse of discretion. (Op., 3).

Finally, the court took up the question of prosecutorial misconduct arising from allegedly prejudicial statements made during closing arguments. Because no objection was lodged in the trial court, the appellate court found the claim unpreserved for appellate review, except for plain error. The court found that the prosecutor's argument was properly responsive to the theory of defense and that the prosecutor did not suggest personal knowledge of witness credibility, but permissibly argued on the basis of the evidence. The court therefore failed to discern grounds for plain error. (Op., 3-4).

Petitioner filed a *pro se* application for leave to appeal to the Michigan Supreme Court. His application raised the same five issues reviewed in the Court of Appeals, but added a sixth claim of ineffective assistance of appellate counsel. By standard order entered April 3, 2004, the state Supreme Court denied leave to appeal. (Michigan Supreme Court Record, docket # 21).

On August 26, 2004, petitioner filed a timely habeas corpus action, raising the same five claims contained in his state Court of Appeals brief.

## AEDPA Standard

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 125 S. Ct. 847, 853 (2005) (citations omitted). If a state court adjudicated the

claim, AEDPA standards must be applied.  28 U.S.C. § 2254(d).  Thus, even in instances where a state court has not clearly articulated its reasoning, if the circumstances suggest that the state court actually considered and decided the issue, the review is not *de novo,* but is limited by the deferential AEDPA standards.  *See Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005); *Onifer v. Tyskiewicz*, 255 F.3d 313, 316 (6th Cir. 2001); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances,  "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721,727 (6th Cir. 2003), *cert. denied*, 540 U.S. 1158 (2004).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.  A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted).  A federal court

may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655. This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d at 943. The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d at 318; *see Miller v. Webb*,

385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry").

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings.  28 U.S.C. § 2254(e 1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Payne v. Bell*, 418 F.3d 644, 663-64 (6th Cir. 2005); *Lancaster*, 324 F.3d at 429.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005); *Abdus-Samad v. Bell*, 420 F.3d 614, 620 (6th Cir. 2005).

## Discussion

### I.     Involuntariness of Confession

Petitioner's first claim is that the state courts erroneously refused to suppress petitioner's statements made to Detective Sgt. Arthur during an interrogation in Beaumont Hospital. Petitioner argues that the statement was rendered involuntary by his state of intoxication, the hospital's administration of morphine, petitioner's weakened physical condition, and improper police interrogation.   The state circuit court rejected petitioner's contentions, after conducting an evidentiary hearing at which petitioner testified.  The state Court of Appeals likewise rejected this claim after reviewing the transcript of the *Walker* hearing.

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  This privilege is applicable to

the states pursuant to the Due Process Clause of the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964). By virtue of these constitutional guarantees, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). When a criminal defendant claims that his confession was rendered involuntary by police coercion, the court must inquire whether, considering the totality of the circumstances, the conduct of law enforcement officials overbore the will of the accused. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). Although subsidiary findings of fact of the state courts are binding on a habeas court in the absence of clear and convincing evidence, ultimate conclusions, such as voluntariness, are not. *See Miller*, 474 U.S. at 117. Consequently, despite the finding of voluntariness by the state courts, this court must reach its own judgment, guided by the AEDPA standards of review.

The Supreme Court has established that a suspect's state of mind, standing alone, cannot render a statement involuntary. Rather, official coercion is a necessary element. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The factual inquiry must focus on both the characteristics of the accused and the details of the interrogation. *See Schneckloth*, 412 U.S. at 225. Among the factors considered relevant by the Supreme Court are the "crucial element of police coercion," the length of the interrogation, its location and continuity, the defendant's maturity, physical condition and mental health, and whether the police advised the defendant of his rights. *Williams v. Withrow*, 507 U.S. 680, 693-94 (1993).

In *Connelly*, the petitioner approached a uniformed police officer and told him that he had murdered someone and wanted to talk about it. When asked by the police officer whether

-22-

he had been drinking or was taking drugs, Connelly denied both.  *Id.* at 160.  He acknowledged that he had, in the past, been hospitalized in mental hospitals, but, despite being advised of his rights, he told the officer that he wanted to talk because his conscience had been bothering him.  *Id.*  He then proceeded to give the police details and pointed out the location of the murder to the officers.  *Id.* at 160-61.  Connelly gave no indication that he was suffering from any kind of mental illness at the time of the confession.  *Id.* at 161.  In the morning, after Connelly had been held overnight by the police, he became visibly disoriented while talking with the public defender's office.  He began giving confused answers, stating "that 'voices' had told him to come to Denver and that he had followed the directions of these voices in confessing."  *Id.*  Connelly subsequently was found to be suffering from chronic schizophrenia and was initially held incompetent to stand trial.  The Supreme Court held, that, because the police had not engaged in any coercive police activity, the confession could not be found to be involuntary.  *Id.* at 166-67.

Nevertheless, the *Connelly* Court expressly reaffirmed the validity of its prior decisions addressing voluntariness.  *Id.* at 163-65.  As the *Connelly* Court observed, the Supreme Court has on more than one occasion addressed concerns about the physical and mental condition of a suspect and found that, depending on the seriousness of the circumstances, the detective's knowledge of those conditions before questioning may be sufficient to constitute the necessary state action to establish a due process violation.  For example, in *Blackburn v. Alabama*, 361 U.S. 199, 207-08 (1960), the Court held that evidence "establish[ing] the strongest probability that [the petitioner] was insane and incompetent at the time he allegedly confessed . . ." was sufficient to establish a due process violation when considered in light of the eight-hour sustained interrogation in a tiny room filled with police officers, the absence of friends, relatives or legal counsel, and the

-23-

fact that the deputy sheriff composed the confession language.  The Court reached its decision notwithstanding the fact that the interrogating officers thought the suspect was sane at the time he confessed.  *Id.*; *see also Townsend v. Sain*, 372 U.S. 293, 309 (1963) (noting that Court's finding in *Blackburn* did not depend on officers' stated belief that suspect did not appear insane or incompetent at the time the testimony), *overruled on other grounds by Keeney v. Tomayo-Reyes*, 504 U.S. 1 (1992).

Similarly, in *Mincey v. Arizona*, 437 U.S. 385, 398-400 (1978), the Court overturned a state court's determination that a statement taken from a hospitalized suspect was voluntary.  The Court found that police officer's questioning violated due process:

> It is hard to imagine a situation less conducive to the exercise of "a rational intellect and a free will" than Mincey's.  He had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician.  Although he had received some treatment, his condition at the time of Hust's interrogation was still sufficiently serious that he was in the intensive care unit.  He complained to Hust that the pain in his leg was "unbearable."  He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent.  Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus.  He was, in short, "at the complete mercy" of Detective Hust, unable to escape or resist the thrust of Hust's interrogation.
>
> In this debilitated and helpless condition, Mincey clearly expressed his wish not to be interrogated. . . .

*Id.*

The Supreme Court decisions in *Connelly*, *Blackburn*, *Townsend*, and *Mincey* certainly create the possibility that a police officer's knowing exploitation of a suspect's weakened physical condition, or the suspect's confusion due to the administration of drugs, can amount to official coercion sufficient to render a statement involuntary.  The question whether a particular

-24-

interrogation was in fact coercive, however, depends on the specific facts presented by the case. In reviewing such a question in a federal habeas proceeding, the court is bound by the findings of historical fact made by the state trial and appellate courts, in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). In the present case, the state courts' findings of fact are fatal to petitioner's Fifth Amendment claim. The state trial court found the testimony of both Detective Arthur and Nurse DiMaria to be credible concerning petitioner's state of alertness. Although petitioner had been intoxicated at the time of his arrest at 6:30 a.m., the interrogation did not take place until after 3:00 p.m., giving petitioner plenty of time to become sober. The trial court found that three hours had passed since the last administration of morphine and that the evidence did not "indicate to me a person that was under the influence of medication to the extent that it would somehow have an influence on his ability to think clearly in this matter." (TT II, 211). Both the trial court and the appellate court were impressed by petitioner's voluntary, and even enthusiastic, agreement to a request to photograph his wounds, because of his desire to sue the City of Detroit, an event that showed petitioner's clarity of thought. The state courts found no credible evidence of threats or coercion, and they both found that petitioner had been advised of and had waived his *Miranda* rights. All of these findings are amply supported by the evidentiary record made at the *Walker* hearing, and petitioner has not produced any clear and convincing evidence to the contrary.

These facts serve to distinguish this case from both *Blackburn* and *Mincey*, in which the suspect was in much more vulnerable circumstances and the evidence clearly showed abuse by officers. Furthermore, the explanation of petitioner's *Miranda* rights further distinguishes this case and supports a finding of voluntariness. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000)

(cases in which a defendant can make a colorable argument that self-incriminating statement was compelled after *Miranda* warnings are "rare.").

In order to prevail on his claim, petitioner must demonstrate that the state courts' decision amounted to the "unreasonable application" of Supreme Court authority under 28 U.S.C. § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003); *Hunt v. Mitchell*, 261 F.3d 575, 580 (6th Cir. 2001). Petitioner cannot do so on the present record. The state trial court carefully examined petitioner's claim of involuntariness in a full evidentiary hearing and made reasonable findings on the basis of the evidence. On appeal, the state Court of Appeals applied the correct legal standard, viewing the totality of the circumstances to determine whether the statement was involuntary. The state courts considered petitioner's physical and mental state, his past contacts with the criminal justice system, whether he was advised of his *Miranda* rights, the testimony of medical professionals concerning his physical and mental state, and other relevant factors. *See Williams*, 507 U.S. at 693-94. No aspect of the state courts' decision may be deemed unreasonable in these circumstances.

Furthermore, any error in introducing the statement must be deemed harmless. An error is considered harmless unless the habeas court finds that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *See Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir. 1999) (holding that *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), standard continues to apply on habeas review even after the amendments to the AEDPA), *abrogated in other part by Williams v. Taylor*, 529 U.S. 362, 412-413 (2000); *see also Penry v. Johnson*, 532 U.S. 782, 796 (2001) (applying *Brecht* standard in § 2254). The habeas petitioner must establish that the error resulted in actual prejudice. *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000). The

harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error. *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999).

The admission of petitioner's statement was clearly harmless, as the statement was not really inculpatory. In his statement, petitioner vehemently denied aiming his gun at Officer Bryant. By offering this statement, the prosecution introduced the only evidence in the record that petitioner had not aimed at Bryant, as petitioner did not testify. The statement was therefore *exculpatory* on the felonious assault charge. The only inculpatory aspect of the statement was that it tended to establish that petitioner possessed the firearm. The evidence of possession of the firearm, however, was absolutely overwhelming. Both Officer Bryant and Officer Daniel testified to petitioner's possession of the firearm. Other officers who arrived at the scene immediately also saw the gun on the ground near petitioner. Although the serial number on the handgun had been obliterated, the State Police Crime Laboratory was able to restore it and to match it to the serial number on the pistol case found locked in the trunk of petitioner's car. The magazine found in the gun case was of the same size and style as the magazine in the gun seized from petitioner. On this record, any incremental corroboration provided by petitioner's statement on the possession of a firearm was cumulative and harmless under the *Brecht* standard.

In summary, I find that petitioner's challenge to the introduction of his statement into evidence cannot be sustained, as the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

## II.      Failure to Record Statement

Petitioner's second claim for habeas corpus relief is that Detective Arthur violated his right to due process by failing to record his statement by audio or video tape.  In the state Court of Appeals, petitioner's counsel presented this argument as a request for the state courts to interpret the Michigan Constitution as requiring the recording of statements, as the Alaska Supreme Court had done in *Stephan v. State*, 711 P.2d 1156, 1158 (Alaska 1985).  Petitioner's brief recognized that the United States Supreme Court had never recognized such a right as constitutionally required, but argued that the state's constitutional guarantees should be extended beyond the provisions of the United States Constitution.  (Brief of Defendant/Appellant at 11, found in Michigan Court of Appeals Record, docket # 20).

AEDPA allows the federal courts to grant habeas corpus relief only if a decision of the state courts is contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).  The habeas court may consider only the clearly established holdings, and not the dicta, of the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  The decisions of lower federal courts may not be consulted.  *Id.* at 381.  In the present case, petitioner can cite to no federal authority, let alone a Supreme Court decision, in support of his due-process claim.  In fact, an unpublished decision of the Sixth Circuit Court of Appeals has already rejected *Stephan v. State* as an authoritative source of constitutional law.  "Contrary to the reasoning of the Alaska Supreme Court, federal law does not require that a state electronically record custodial interrogations and confessions." *United States v. Dobbins*, No. 96-4233, 1998 WL 598717, at * 3 (6th Cir. Aug. 27, 1998) (citing *United States v.*

*Coades*, 549 F.2d 1303, 1305 (9th Cir. 1997)); *accord Reinert v. Larkins*, 379 F.3d 76, 94 n.4 (3d Cir. 2004), *cert. denied*, 126 S. Ct. 173 (2005).

In the absence of any holding of the United States Supreme Court establishing a due-process right to the taping of confessions, petitioner's second ground for habeas corpus relief must be rejected.

### III.    Sufficiency of the Evidence

Petitioner challenges the sufficiency of the evidence to support a conviction for felonious assault.[4]  The state Court of Appeals rejected this claim, finding that the evidence was sufficient to establish each element of the assault charge beyond a reasonable doubt.  The task for a federal habeas court is to determine whether this decision was contrary to or represented an unreasonable application of clearly established Supreme Court authority.  28 U.S.C. § 2254(d).

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove each element of an offense beyond a reasonable doubt.  *See Victor v. Nebraska*, 511 U.S. 5 (1994).  In a section 2254 challenge to the sufficiency of evidence supporting a state criminal conviction, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 483 U.S. 307, 319 (1979); *accord United States v. Barnett*, 398 F.3d 516, 522 (6th Cir.), *cert. dismissed*, 126 S. Ct. 33 (2005).  In applying this standard, the federal court is bound by the substantive elements of the criminal offense as defined by state law.

---

[4] If petitioner's felonious assault conviction is overturned, the conviction for possession of a firearm during the commission of a felony would likewise fall, as the assault charge was the predicate offense for the felony-firearm conviction.

*Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).  When assessing the sufficiency of the evidence in the habeas context or on direct appellate review of a federal conviction, the reviewing court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.  *United States v. Wagner*, 382 F.3d 598, 610-11 (6th Cir. 2004); *United States v. Chavez*, 296 F.3d 450, 455 (6th Cir. 2002).  Questions of credibility are for the jury.  *See Herrera v. Collins*, 506 U.S. 390, 417-18 (1993).

Under Michigan law, the elements of felonious assault are (1) an assault, (2) with a dangerous weapon, (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery.  *See People v. Avant*, 597 N.W.2d 864, 869 (Mich. Ct. App. 1999); *accord Gardner v. Kapture*, 261 F. Supp. 2d 793, 804 (E.D. Mich. 2003).  Felonious assault is a specific-intent crime, which requires that defendant either intend to injure his victim or intend to put the victim in reasonable fear of immediate battery.  *See People v. Robinson*, 378 N.W.2d 551, 552 (Mich. Ct. App. 1985).  Evidence of intent may be proven by inference from any fact in evidence, and minimal circumstantial evidence is sufficient to establish an actor's state of mind.  *People v. McRunels*, 603 N.W.2d 95, 102 (Mich. Ct. App. 1999).  The Michigan courts have described felonious assault as simple assault aggravated by the use of a dangerous weapon.  *See People v. Grant*, 535 N.W.2d 581, 582 (Mich. Ct. App. 1995).  The crime is complete when the perpetrator points a gun at the complainant with the requisite intent, even if no shots are fired.  *See People v. Johnson*, 284 N.W.2d 718 (Mich. 1979); *see also People v. Doud*, 193 N.W. 884, 885 (Mich. 1923) (crime complete with pointing of gun, even if it was not loaded).

The testimony of Officer Bryant, if accepted by the jury, was completely sufficient to prove each element of felonious assault.  Bryant testified that as he was chasing petitioner,

petitioner pulled a Glock pistol from his waistband with his right hand. The officer pushed petitioner to the ground from behind, causing petitioner to fall forward on his stomach. Petitioner then began to roll over to a sitting position with the gun in his right hand. Despite the officer's warnings, petitioner continued to raise his weapon and directed it at him. "In fear for my life, I fired my weapon." (TT II, 270-72). From this testimony the jury could, and obviously did, conclude that petitioner assaulted Bryant with a deadly weapon with the intent to put him in reasonable fear of an immediate battery.

In the state appellate court and now in this court, petitioner invites the court to disbelieve Bryant's testimony and to accept the version of events set forth in petitioner's unsworn statement to Detective Arthur. Such reweighing of the evidence is improper on habeas corpus review under the *Jackson v. Virginia* standard. *See Chavez*, 296 F.3d at 455. Furthermore, in a supplemental submission to the court (docket # 10), petitioner invites the court to consider a photograph to conclude that "it's impossible" for the event to have occurred as testified by Bryant.[5] Again, petitioner's invitation for this court to retry the facts of this criminal case is improper. *See Bell v. Cone*, 535 U.S. 685, 693-94 (2002).

The trial record, viewed in a light most favorable to the prosecution, amply supports the jury's verdict on the felonious assault charge. Petitioner's third ground for habeas corpus relief must therefore be rejected.

---

[5] In fact, all the evidence supports the officer's testimony. Contrary to petitioner's contention that he was shot from behind, the medical evidence indicates that the bullet entered petitioner's right armpit and exited near his scapula. Petitioner could not possibly have incurred such a wound from behind. The only way that the bullet could have entered his armpit is if petitioner's right arm were raised, just as Bryant testified.

IV.     **Introduction of Evidence of Petitioner's Parole Status**

Petitioner next contends that the trial court erred by allowing introduction of evidence that petitioner was on parole at the time of the offense.  The court determined that this evidence was probative of petitioner's motive, as it tended to explain why he ran when the officers were about to discover his handgun.  The trial judge carefully limited the evidence to the fact of petitioner's parole status and prevented the prosecutor from introducing any of the details of the two felonies for which petitioner was then on parole.  On appeal, the Michigan Court of Appeals affirmed the trial court, finding that the probative value of the evidence was not significantly outweighed by its prejudicial effect and that the court had appropriately limited the possibility of prejudice by limiting the scope of the evidence.

Petitioner has not cited, either in the state courts or this court, any decision of the United States Supreme Court that clearly establishes a federal right in this area.  The decision whether to admit evidence that petitioner was on parole was governed exclusively by the state evidence rules, which require a balancing of any prejudicial effect against the probative value of the evidence.  *See* MICH. R. EVID. 403.  The Supreme Court has underscored the principle that federal habeas corpus relief does not lie for errors of state law, including state evidentiary rulings.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  The Court has long held that admission of evidence of prior convictions is a matter of state law and does not implicate the fundamental fairness of a criminal trial.  *See Spencer v. Texas*, 385 U.S. 554, 563-66 (1967); *accord Marshall v. Lonberger*, 459 U.S. 422, 438-39 n.6 (1983).  Simply put, the admission of this evidence implicates no due-process concerns and cannot form the basis for habeas corpus relief.

### V.      Prosecutorial Misconduct

Petitioner's final ground for habeas corpus relief arises from alleged misconduct by the assistant prosecutor during argument.  Petitioner points to numerous statements in which the prosecutor characterized the defense's position as requiring the jury to reject as lies all of the prosecution's evidence.  Petitioner contends that this tended to denigrate the defense and amounted to improper vouching for the credibility of the prosecution's witnesses.

The state Court of Appeals found that this issue was not preserved for appellate review, because no contemporaneous objection was lodged in the trial court.  Therefore, the appellate court reviewed the issue only for plain error.  This finding would bar habeas corpus review of this issue under the doctrine of procedural default.  *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); *see also Coleman v. Thompson*, 501 U.S. 722, 741 (1991) (state court review for plain error does not foreclose application of procedural default).  Because the analysis of procedural default is complex, however, the court has discretion to proceed to the merits of an issue, despite an apparent procedural default, where the claim is clearly meritless.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir.), *cert. denied*, 543 U.S. 880 (2004).

The threshold question in habeas corpus analysis is whether the due-process right relied upon by petitioner has been clearly established by decisions of the United States Supreme Court.  28 U.S.C. § 2254(d).  In the context of this case, the question is whether the proposition that the prosecutor violates the Due Process Clause by attacking witness credibility has been clearly established by holdings of the Supreme Court.  I find that it has not.  Although the Court has recognized that certain prosecutorial misconduct, if severe and pervasive, can violate the Due Process Clause, *see, e.g., Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Napue v. Illinois*,

360 U.S. 264, 269 (1959) (presentation of knowingly false testimony), the Court has never condemned under due-process principles prosecutorial "vouching." The Court's only occasion to opine in this area arose in a federal prosecution in which the prosecutor shared with the jury his "personal impression" that the defendant intended to commit fraud. *United States v. Young*, 470 U.S. 1 (1985). Examining the totality of the proceedings, the Court refused to find that the prosecutor's remark constituted plain error. In reaching this conclusion, the Court said that a prosecutor violates rules of professional conduct by expressing his personal belief as to the truth or falsity of any testimony or evidence of the guilt of the defendant. 470 U.S. at 7. The Court nevertheless refused to find plain error. Two observations must be made concerning the sufficiency of the *Young* decision to satisfy AEDPA's requirement that a constitutional right be clearly established by holdings of the Supreme Court. First, the *Young* Court was not engaged in constitutional adjudication, but was merely reviewing a federal trial for the presence of plain error. The Court did not cite the Due Process Clause or any of its cases decided thereunder. Although the Court said that vouching can be unprofessional, it has never said that vouching is unconstitutional. Second, the Court's comments concerning this particular species of prosecutorial misconduct were clearly *dictum*, as the Court went on to hold that the prosecutor's error, whatever it may have been, did not affect the fundamental fairness of the trial. 470 U.S. at 20. Consequently, petitioner cannot point to any Supreme Court holding that condemns under federal constitutional principles comments by the prosecutor that may be construed as expressing a personal opinion concerning witness credibility.

The lower federal courts have generally condemned vouching by the prosecutor, and often analyze the issue under federal due-process principles. *See, e.g., Washington v. Hofbauer*, 228

F.3d 689, 700-01 (6th Cir. 2000).  Lower federal courts have generally recognized two types of objectionable vouching.  The first type impermissibly places the government's prestige behind the witness to bolster the witness's credibility.  *See United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004); *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001); *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).  In the second type of impermissible vouching, also known as "bolstering," the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See United States v. Owens*, 426 F.3d 800, 807 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1089 (2006); *Hodge v. Hurley*, 426 F.3d 368, 377-78 (6th Cir. 2005).  As noted above, however, the district court may not refer to decisions of lower federal courts in determining whether the state courts have issued a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *See Williams v. Taylor*, 529 U.S. at 412.  In the present case, it is impossible to point to a Supreme Court decision that clearly establishes the principle that remarks of the prosecutor commenting on credibility violate the federal Due Process Clause.  Petitioner's argument therefore falters at the first step of analysis under AEDPA.

Even if this court were to refer to lower federal court decisions, no impermissible vouching occurred in this case.  The prosecutor's comments did not suggest that he had secret knowledge of facts bearing on the credibility of the witnesses, nor did he attempt to inject his personal opinion.  Rather, he confined his comments to the demeanor and plausibility of the witnesses' testimony.  This sort of comment does not constitute prosecutorial misconduct.  A prosecutor has the right and the duty to argue the record, highlight inconsistencies in the defense, and

forcefully assert reasonable inferences from the evidence. *See, e.g., Bates v. Bell*, 402 F.3d 635, 646 (6th Cir.), *cert. denied*, 126 S. Ct. 163 (2005); *Greer v. Mitchell*, 264 F.3d 663, 683 (6th Cir. 2001).[6]

        Consequently, even assuming a constitutional right cognizable on habeas corpus review under AEDPA standards, the decision of the Michigan courts cannot be deemed contrary to any such right. The Michigan Court of Appeals accurately noted that the prosecutor's argument was responsive to the theory raised by the defense. The defense was clearly based upon the proposition that Officer Bryant panicked, shot petitioner without justification, and then attempted to cover up his wrongdoing by accusing petitioner falsely of having aimed his gun at Bryant first. Indeed, in his submissions to this court, petitioner persists in asserting that the prosecution was "a successful attempt to cover up a fellow officer from another city's mistake of shooting me as a result of a traffic stop." (docket # 10, at 1). The prosecutor's arguments were all designed to refute the accusation that the officers were lying as part of a coverup. The state Court of Appeals also correctly noted that the prosecutor did not suggest personal knowledge of witness credibility but permissibly argued credibility on the basis of the evidence. (Op., 3-4). Therefore, even assuming that prohibitions against vouching developed by the lower federal courts were somehow applicable in this case, the arguments of the prosecutor did not run afoul of any such principle.

---

[6] The argument must also be examined in context rather than in isolation. *See Lundgren v. Mitchell*, No. 02-3001, ___ F.3d ___, 2006 WL 589356, at * 19 (6th Cir. Mar. 13, 2006).

**Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.

Dated:  March 16, 2006                    /s/  Joseph G. Scoville
                                          United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).